```
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF WEST VIRGINIA

 3   United States of America,

 4         Plaintiff,

 5               VS.                    CRIMINAL ACTION NO.

 6                                      5:18-cr-2

 7   Marius Brown,

 8         Defendant.

 9                              - - -

10      Proceedings had in the detention hearing of the

11   above-styled action on February 7, 2018, before Honorable James

12   E. Seibert, Magistrate Judge, at Wheeling, West Virginia.

13                              - - -

14      APPEARANCES:

15      On behalf of the United States of America:

16      Stephen L. Vogrin
        Assistant United States Attorney
17      P.O. Box 591
        Wheeling, WV  26003
18      304.234.0100

19      On behalf of the Defendant:

20      Brendan S. Leary
        Federal Public Defender's Office
21      1125 Chapline Street
        Wheeling, WV  26003
22      304.233.1217

23      The Defendant was present in person.

24      Proceedings recorded utilizing tape.
        Transcript produced by computer-aided transcription.
25
```

Cindy L. Knecht, RMR/CRR/CBC/CCP
PO Box 326   Wheeling, WV   26003   304.234.3968

1                         INDEX TO WITNESSES

2                              Direct   Cross   Redirect   Recross

3    GOVERNMENT'S WITNESSES:

4    HEATHER KOZIK                   3       8

5

6                         INDEX TO EXHIBITS

7                              Identified   Admitted

8    GOVERNMENT'S EXHIBITS

9    Exhibit 1                        7
     Statement of Miana McGaha
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           Wednesday Morning Session,

2           February 7, 2018, 9:59 a.m.

3                    - - -

4        THE COURT:  Good morning.  This is United States

5   versus Marius Brown.  Case number is -- I don't see it right

6   now, but I'll find it eventually.  It's 5:18-CR-2.  The

7   government's here by Mr. Vogrin.  The defendant's here in

8   person and by his counsel, Mr. Leary.  The time was set for a

9   detention hearing.

10          The government may call its first witness.

11          MR. VOGRIN:  Heather Kozik, Your Honor.

12          THE CLERK:  The witness is Heather Kozik, K-O-Z-I-K.

13      **HEATHER KOZIK, GOVERNMENT'S WITNESS, SWORN**

14               DIRECT EXAMINATION

15   BY MR. VOGRIN:

16   Q.   Please state your name and occupation.

17   A.   Heather Kozik.  I'm an ATF special agent here in Wheeling.

18   Q.   Were you involved in the investigation of Marius Brown for

19   an unlawful possession of a firearm?

20   A.   I was.

21   Q.   Those events occurred on October 21st, 2017, correct?

22   A.   Correct.

23   Q.   If we could please tell the Court how you became involved.

24   A.   I believe I was contacted by Detective McKenzie requesting

25   our assistance.  What happened was on the 21st of October, the

HEATHER KOZIK - DIRECT

1  Wheeling Police Department responded to a phone call in which
2  Marius Brown had allegedly busted out a window of a vehicle
3  with a firearm.  They responded on scene.  They came in contact
4  with the caller and they also came in contact with Marius
5  Brown.
6  Q.   Who was the caller?
7  A.   It was the girlfriend or ex-girlfriend at the time of
8  Marius Brown, and I'm going to say her name incorrectly, so I
9  apologize.  Mahia McGaha.
10 Q.   And where, in fact, did they locate Ms. McGaha?
11 M-C-G-A-H-A?
12 A.   She was seated in the vehicle of her -- her vehicle, which
13 was parked outside of Virginia Street.
14 Q.   On Wheeling Island?
15 A.   Correct.
16 Q.   Okay.  What did the officers observe when they approached?
17 A.   Marius Brown was attempting to reenter the residence, his
18 residence.  He made several comments that it was his residence.
19 They asked him to raise his hands and when he did so, they
20 observed that his hands were bleeding.  One officer attempted
21 to talk to him, but he just kept insisting that he wanted to go
22 into his residence.  They spoke to her and she stated she had
23 been into an argument with Marius Brown.  She was attempting to
24 collect her belongings from the residence when there was an
25 altercation and ultimately he followed her out to the car where

1 he busted out the window.
2 Q. Did she indicate what he busted the window out with?
3 A. A firearm.
4 Q. Was there evidence on the vehicle that indicated that the
5 window was busted out?
6 A. The rear driver's side window was busted out.
7 Q. Did officers identify or notice any blood or anything
8 around the area?
9 A. I believe there was blood in that vicinity.
10 Q. Did Ms. McGaha advise officers what that argument involved
11 or what happened during that argument?
12 A. She stated that she had quit living at the residence
13 approximately a week prior, but she was told that she could
14 come to the residence and pick up her belongings. She entered
15 the house. She said that Marius Brown saw her enter the house
16 and that she went upstairs to the bedroom or to the bedroom to
17 collect her belongings. He followed her inside and he got
18 upset that she was getting her stuff. She said he spit on her
19 three times and told her to get out. She said she did intend
20 to get out. He grabbed a firearm. She didn't indicate he
21 pointed it at her, but when she tried to get out, he punched
22 her in the face or slapped her in the face.
23     He then said he was going to shoot her, according to
24 the report, and told her to get out again, but she said she was
25 too scared that he was just going to hit her again and he

1   promised he wouldn't, at which point she was able to run out of
2   the house.  He followed her out of the house and that's when
3   the vehicle window was busted.
4   Q.   Did officers subsequently arrest Mr. Brown on scene?
5   A.   He was.
6   Q.   And did they attempt to get a search warrant to enter the
7   residence to search for the firearm?
8   A.   They did obtain a search warrant, yes.
9   Q.   And what did they discover after execution of that search
10  warrant?
11  A.   They discovered a Smith & Wesson pistol inside the kitchen
12  area of the residence which appeared to have blood on it.
13  Q.   Was the firearm loaded?
14  A.   There was one round in the chamber.  The magazine was not
15  in it at the time, though there's actually two magazines
16  located.
17  Q.   Was one of those an extended-type magazine?
18  A.   Yes.  I believe it held 17 rounds.
19  Q.   Was there evidence of drug activity located in the
20  residence?
21  A.   There was.  There was digital scales recovered, I believe
22  a cell phone, there was a quantity -- two baggies containing
23  quantities of powdered cocaine, a baggie containing crack
24  cocaine, and a baggie of marijuana.  All that field tested
25  positive.

1  Q.  Was there any research done on the firearm?
2  A.  Yes, yes.  It had recently been stolen.  I don't remember
3  the exact time frame, but it had recently been stolen from
4  Cleveland, Ohio.
5  Q.  Along with the magazines and the holster that was found?
6  A.  Correct.
7        MR. VOGRIN:  Judge, may I approach.
8        THE COURT:  You may.
9        MR. VOGRIN:  Have this marked as Exhibit 1, please.
10 Q.  Show you what's been marked as Exhibit 1.  Do you
11 recognize what that is?
12 A.  That's the statement that McGaha wrote on the night of the
13 accident or the day of the incident.
14 Q.  Is that the handwritten statement from Miana McGaha?
15 A.  Correct.
16 Q.  Okay.  McGaha.  And that was done the night of the arrest
17 of Mr. Brown?
18 A.  Correct.
19       MR. VOGRIN:  Your Honor, I move its admission for
20 purposes of this hearing only.
21       MR. LEARY:  No objection, Your Honor.
22       THE COURT:  Admitted.
23       MR. VOGRIN:  No further questions.
24       THE COURT:  Mr. Leary.
25       MR. LEARY:  Your Honor, I thought my tech game was

1   weak.
2           MR. VOGRIN:  I knew it was broken.
3           MR. LEARY:  My understanding was all you have to
4   do -- I wasn't even a member of the AV club, and you're old
5   enough to remember what that is.
6           THE COURT:  I am.
7           MR. LEARY:  Thank you, Your Honor.
8                        CROSS-EXAMINATION
9   BY MR. LEARY:
10  Q.   Agent Kozik, you were not present the evening of this
11  incident on Wheeling Island with Ms. McGaha and Mr. Brown,
12  true?
13  A.   Correct, I was not present.
14  Q.   Okay.  And you spoke with the detective from the Wheeling
15  Police Department about all of this?
16  A.   Correct.
17  Q.   And then you gathered some records?
18  A.   Correct.
19  Q.   And you've reviewed some police reports from the officers
20  who were involved that day?
21  A.   Correct.
22  Q.   Did you review the criminal complaints that were filed in
23  state court?
24  A.   I did.
25  Q.   Okay.  And did you speak with those officers?

1   A.   I don't believe I did.
2   Q.   Okay.  So just so we're straight, Ms. McGaha reports to
3   some officers about what Mr. Brown had said during this
4   altercation, correct?
5   A.   Correct.
6   Q.   All right.  So Mr. Brown says something to Ms. McGaha,
7   true?
8   A.   Yes.
9   Q.   She tells the officers?
10  A.   Correct.
11  Q.   The officers put it in their report?
12  A.   Correct.
13  Q.   And you read the report.
14  A.   Correct.
15  Q.   Okay.  Have you interviewed Ms. McGaha?
16  A.   I have not.
17  Q.   Did you see the car window?
18  A.   I saw the thumbprint picture.
19  Q.   Okay.  Ms. McGaha claimed that she was living there or had
20  been staying there?
21  A.   I believe, according to the report, she stated she had
22  been kicked out that previous -- a couple days prior and that
23  she was coming to collect her belongings.
24  Q.   Okay.  So she was either staying there or living there, we
25  can conclude?

1  A.  Prior to being kicked out, yes.

2  Q.  You can conclude.  Okay.

3      Who else was living there?

4  A.  She told the officers that he was the only occupant

5  besides herself when she left, to her knowledge.

6  Q.  And then who else was guests in that house; do you know?

7  A.  I have no information about that.

8  Q.  Ms. McGaha report to the officers anything about --

9  A.  She reported no additional people.

10 Q.  Okay.  And the drug paraphernalia that was in the house,

11 you don't know whose drug paraphernalia that is, correct?

12 A.  I didn't ask any questions, when I interviewed Mr. Brown,

13 about the drug paraphernalia.

14 Q.  You did interview Mr. Brown.

15 A.  I did, but not about the drug paraphernalia.

16 Q.  When did you interview Mr. Brown?

17 A.  I don't know the exact date.  It was after he was in

18 custody down at the regional.

19 Q.  Okay.  On these charges?  On the state charges?

20 A.  On the possession of the firearm.

21 Q.  And you went to the Northern Regional Jail to interview

22 him?

23 A.  Correct.

24 Q.  And was his attorney present?

25 A.  He didn't have a federal attorney at that point in time.

1  Q.   Did he have a state attorney?
2  A.   I'm not sure if he would have been appointed one at that
3  time or not.
4  Q.   Do you know whether he had had -- approximately how many
5  days or weeks after this incident did you meet with him at the
6  Northern Regional Jail?
7  A.   I honestly have no idea how recent it was to the arrest.
8  Q.   A day or two?
9  A.   I honestly don't remember.
10 Q.   Weeks?
11 A.   I honestly don't remember if it was the next day or the
12 next week or the next month.  I honestly don't remember.
13 Q.   Had he been in court, in state court, before you met with
14 him at the Northern Regional Jail?
15 A.   Again, I don't remember how recent to the arrest it was
16 that I went down there.
17 Q.   So you have no idea whether he had an attorney present?
18 A.   There was no present --
19 Q.   Excuse me.
20 A.   No.
21 Q.   And did he make -- what did he tell you when you
22 interviewed him?
23 A.   He told me that it was his firearm, that he had just
24 purchased it, I believe the week prior, on the island.
25 Q.   Did you advise him of his right to remain silent?

1  A.   I did read him his rights before I asked him any
2  questions.
3  Q.   And did you tape that?
4  A.   No.
5  Q.   You're aware of the Department of Justice's policy on
6  taping interviews of people who are in custody, correct?
7  A.   I am aware of that policy.
8  Q.   Okay.  But you didn't follow it?
9  A.   No.  Actually --
10           MR. VOGRIN:  Objection.  It's not relevant.
11           MR. LEARY:  Your Honor, I didn't object to a lot of
12 irrelevant points on direct.  She testified that she
13 interviewed him.
14           THE COURT:  I'm going to allow the question and
15 overrule the objection.
16 BY MR. LEARY:
17 Q.   Did you not follow the Department of Justice policy on
18 taping custodial interviews when you interviewed him?
19 A.   No.  In fact, to my knowledge, I did.  The way it's been
20 explained to us is that we're not required to tape the
21 interview unless they're in federal custody on a federal
22 charge.
23 Q.   Okay.  So your distinction here is that no federal lawyer,
24 no federal custody, fair game.  Is that your position?
25 A.   Yeah, we're not required to record that interview.

1  Q.   And you never made -- did you ever make an attempt to
2  determine whether he'd had an attorney appointed?
3  A.   I don't believe I did.
4  Q.   So you don't know anything about Ms. McGaha and her
5  family?
6  A.   I do not.
7  Q.   You don't know anything about when or how she -- the
8  circumstances surrounding her making this written statement
9  that was offered?
10 A.   No.  I wasn't present for it.
11          MR. LEARY:  Thank you, Your Honor.
12          MR. VOGRIN:  No redirect, Your Honor.
13          THE COURT:  Witness is excused.
14          MR. VOGRIN:  No further witnesses.
15          THE COURT:  Mr. Leary.
16          MR. LEARY:  Your Honor, I've interviewed Miana
17 McGaha.  We spoke with her on the phone the other day.  She's
18 25 years old.  She's involved in a relationship with Mr. Brown.
19 She's six months pregnant, due in May, with Mr. Brown's child.
20 She lives with her parents at 2442 National Road in Wheeling.
21 Her parents are -- it's a residence, a single-family home owned
22 by her mother and stepfather, Mona and Raymond Hunter.  They
23 have six bedrooms.  Ms. McGaha works as a baby-sitter and she's
24 also been helping out Mr. Brown in his business that he started
25 last year just before this incident.

1       Miana reported that her mother is 47 years old, used
2  to work at West Virginia Choice but was recently in a car
3  accident and has had some physical complications as a result
4  and hasn't been working recently.  Ms. McGaha reported that her
5  stepfather, Raymond Hunter, is 46 years old and works as a coal
6  miner here in town somewhere locally.  There are three other
7  minor children in the home, ages 17, 14, and eight.  Ms. McGaha
8  has a sister, Vanessa.  She's a full-time student at WVU and
9  comes home on breaks and the summertime.
10      And she also reported that right before this, back in
11 the fall, Mr. Brown had started a company making t-shirts,
12 jackets, hoodies, and other clothing under the name Grindstein,
13 LLC.  And I can report, Your Honor, that on Mr. Brown's
14 Facebook page there's some photographs of him with his family
15 members with, I guess, the first check that he received back in
16 September through this business.
17      And he has screen printers, embellishment machines,
18 and other things to do silk screening and making t-shirts and
19 other items, and he was incorporated with the State of West
20 Virginia in September or October, and that he was working out
21 of his home in an effort to generate some income.
22      She indicated to our investigator that if she was
23 aware of any violations of Mr. Brown's bond, if he were
24 released and permitted to live at this address, which is our
25 proposal, Your Honor, that she would contact the pretrial

1  services officer and make a report.

2  Your Honor, with regard to the bond report, I think
3  he does have some criminal history. A lot of it is quite old.
4  As is typical in an NCIC report, you know, it's listed as drug
5  trafficking and you get records, it's an F5, which is a
6  misdemeanor. My suspicion, Your Honor, in light of the
7  sentences that were imposed of six months, a year probation, et
8  cetera, that they probably are F5s under Ohio law, which is a
9  misdemeanor under West Virginia law and the old common law.

10  So Your Honor, notwithstanding these multiple layered
11  hearsay reports of Ms. McGaha that's been presented as
12  testimony today, I don't think he's a flight risk. I don't
13  think there's been any evidence of that. And I don't think
14  he's a danger. And if the woman who's allegedly the victim
15  here is now telling us that he has a place to stay and she's
16  willing to rat him out to the probation officer, I don't think
17  he's a danger, so I urge the Court to grant --

18  THE COURT: All right. Thank you. I find the
19  defendant's not a flight risk. I find that he has a 17-year
20  history of criminal conduct, including a felony conviction in
21  2015, and I find him to be a danger to the community and I
22  remand him to the custody of the marshals. Thank you very
23  much.

24  (Proceedings concluded at 10:16 a.m.)

25

1                         CERTIFICATE

2

3     I, Cindy L. Knecht, Registered Professional Reporter

4 and Official Reporter of the United States District Court for

5 the Northern District of West Virginia, do hereby certify that

6 the foregoing is a true and correct transcript to the best of

7 my ability of the taped proceedings had in the above-styled

8 action on February 7, 2018, as reported by me in stenotypy.

9     I certify that the transcript fees and format comply with

10 those prescribed by the Court and Judicial Conference of the

11 United States.

12     Given under my hand this 7th day of August 2018.

13                         /s/Cindy L. Knecht
                          Cindy L. Knecht, RMR/CRR
14                         Official Reporter, United States
                          District Court for the Northern
15                         District of West Virginia
                              - - -

16

17

18

19

20

21

22

23

24

25